Pate v. The People.

ALONZO PATE, plaintiff in error, v. THE PEOPLE OF THE STATE OF ILLINOIS, defendants in error.

*Error to Adams.*

On a trial for forgery, a witness was called whose business had been for many years as an officer of a Bank to examine papers with the view of detecting alterations and erasures, and ascertaing spurious from genuine writings and signatures.   He was requested to examine the papers in evidence critically, and to state his opinion to the jury, whether there had been alterations and erasures.   The counsel for the accused objected, but he was permitted to testify:   *Held,* that from the nature of the business in which he had been engaged, he was a competent witness to express his opinion to the jury.

The general rule upon the subject of proof of handwriting is, that proof is not to be made by the comparison of hands, but by the production of witnesses, who have acquired a knowledge of the general character of the handwriting of the party.   The modes of acquiring such knowledge are, either by having seen the party write, or by having seen letters or other documents, which he has, in the course of business, recognized or admitted to be his own.   The witness may examine the writing in question and declare his belief, founded on his previous knowledge, concerning its genuineness.   Where a witness stated that he had seen the prisoner write, but had never seen him write before the difficulty in question arose, it was *held,* that the witness did not come within the rule laid down.

When a witness is called to testify in relation to the handwriting of a party, he should first be asked if he is acquainted with such handwriting; and, if he answer in the affirmative, he is then to be asked as to the manner in which he became so acquainted.

Where instructions were asked, which contained correct principles of law as laid down in the elementary works on evidence, were objected to as being mere abstract propositions of law without any application to the facts of the case, and were given, the appellate Court *held,* that although the Court was not bound to instruct the jury upon such abstract questions of law, still, if they were given, it is not ground of error.

It is only when a Court, in declaring the law, states it erroneously, that its opinion can be revised; and then, if it appear that the instructions given could have had any influence upon the jury, their verdict will be set aside.

It is a familiar doctrine of the law, that the jury is bound to acquit one accused of crime, if they entertain any reasonable doubt of his guilt.

In the record of a criminal case, it appeared that the jury were permitted to disperse from time to time, the trial continuing through several days, but it was silent as to the fact whether the separation was with the consent of the prisoner:   *Held,* that the presumption was that they separated with his consent.

A record in a criminal case failed to show that when the jury retired to con-
sider of their verdict they were placed in the charge of a sworn officer:
*Held*, that the presumption was that the Court performed its duty in that
respect.

In criminal cases, motions for new trials rest entirely in the discretion of the
Circuit Courts where they are made, and the propriety of their decisions in
refusing them cannot be reviewed in the appellate Court.

INDICTMENT for forgery, in the Adams Circuit Court,
against the present plaintiff in error, at the April term 1845,
tried before the Hon. Richard M. Young. The jury found
the defendant guilty and fixed the period of his imprisonment
in the penitentiary at nine years. Judgment accordingly.

The instruments charged to have been forged are set forth
*in hæc verba* in the Opinion of the Court, as also the material
portions of the evidence, &c.

*A. Williams*, for the plaintiff in error, stated the points
only which were relied on for a reversal of the judgment of
the Circuit Court.

*A. Wheat*, for the People.

The counsel for the plaintiff in error seem to have aban-
doned their first assignment, not having urged anything in
support of it.

The second is equally untenable. If it be right ever for
the jury to be informed of the fact, that the evidence intro-
duced by a party in his own favor was manufactured by
himself for the occasion—and of this there can be no doubt—
then was it right for the jury in this case to be informed of
the erasures and alterations to which Phillips testified. And
the only question upon this point is, in what manner should
they be informed of it? It is conceded that an inspection
of the papers by the jury would be one mode, but it is de-
nied that that is the only mode. When the papers are not
brought into Court the mode first suggested would be im-
possible, and it would be the least satisfactory in many cases
where they are brought in. Phillips was an expert, and as
such, was better able from experience to point out the era-
sures and alterations than the jury, who are presumed not

to have made it a business to examine writings with a view of detecting the spurious from the genuine. Besides dimness of eyesight in some of the jury would render the mode resorted to in this case absolutely indispensable.

The objection to Crawford's testimony was properly sustained. It is not sufficient that a witness has barely seen a party write; he must be acquainted with his hand writing, or have some notion of its character from having seen him write, or from a correspondence with him, before he will be permitted to express an opinion relative to it. And if it appear that the witness' knowledge was acquired under such circumstances, as would show that the party had a motive for disguising his handwriting, then he is incompetent. Else a party would be permitted to manufacture testimony for himself. 1 Esp. 14; 2 Stark. Ev. 374; 3 Phillips on Ev. 1322; *Doe* ex dem. *Mudd* v. *Suckermore*, 31 Eng. Com. Law R. 406. Such is the case here. Crawford never saw the plaintiff write until after the papers charged to have been forged by him made their appearance, or under any other circumstances than would show he had the strongest motive for disguising his hand writing. Besides, it appeared from the evidence at the same time, that the plaintiff, from the commencement of the transaction seemed to be impressed with a belief, that in order to make the papers avail him, it was necessary for him to procure testimony, *aliunde* the papers themselves, that they were not executed by him but by Randall, and that he had actually made sundry attempts to do so.

The instructions asked for by the prosecuting attorney are law. 1 Stark. Ev. 487, 496, 513–14, 523. And they are not mere abstract propositions, but have direct relevancy to the case. But if they were mere abstract propositions of law, the giving them would not be error, for they could not have misled the jury. 5 Ohio, 556, 240; 1 Dana, 156; 9 Cowen, 680.

The counsel for the plaintiff are mistaken in supposing that the Court below refused the instructions prayed for by them. The record shows that these instructions were given

with a single qualification as to the meaning of a reasonable doubt, which, when taken altogether, is substantially correct and could not have misled the jury.

This Court has already decided in the case of *McKinney* v. *The People*, 2 Gilm. 540, that unless it affirmatively appear from the record that the jury dispersed without the consent of the prisoner, it would presume such consent; and also that a sworn officer attended the jury when they retired to consider of their verdict, unless it should in like manner appear from the record that one did not. That case is conclusive of these two points in this.

At Common Law, a new trial cannot be granted in a case of felony where the proceedings are regular. 1 Chitty's Crim. Law, 653; *The People* v. *Comstock*, 8 Wend. 549. We proceed in criminal cases according to the course of the Common Law, (Rev. Stat. 186, § 188,) and therefore our Courts possess no power to grant a new trial in cases of felony. At most, our Courts possess but a discretionary power in the matter, and consequently a refusal to grant a new trial in such a case, could not be assigned for error. The 23d section of the Revised Statutes, 416, applies only to civil cases.

*O. C. Skinner*, upon the same side, cited the following authorities: 1 Phil. Ev. 290, 4 Durn. & East. 497, bottom page; 8 Vesey, 474, and note; Ibid. 476, notes: 1 Phil. Ev. 217–18; 31 Eng. Com. Law R. 406; 2 Pirtle's Dig. 106, §§ 7, 10; Wilcox's do. 377; Roscoe's Crim. Ev. 96; 1 Phillips' Ev. 491.

*O. H. Browning & N. Bushnell*, for the plaintiff in error.

1. We insist that it was error in the Court below to permit the jury to disperse after having been sworn, and after evidence had been submitted to them.

By the Criminal Code of this State, all trials for criminal offences are to be conducted according to the course of the Common Law, except when a different mode is pointed out by the Criminal Code. Rev. Laws, 1833, 213, § 178.

By the rules and requirements of the Common Law, the jury must be kept together, in criminal cases, after evidence given upon the issue. 3 Thomas' Coke, 392.

And this rule of the Common Law has not been repealed or modified by our statute. It was therefore improper in the Court to permit the jury, in this case, to disperse after evidence had been given and progress made in the trial, which, however, they repeatedly did; and where there has been an improper separation of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of a presumption that the irregularity has been prejudicial to him; and it is incumbent upon the Government to show, and that beyond a reasonable doubt, that the prisoner has suffered no injury by the departure from the forms ordinarily pursued in the administration of justice. *State* v. *Prescott*, 7 New Hamp. 292; *People* v. *McKay*, 18 Johns. 217.

These irregularities may not have affected the prisoner, but that is not enough. Even if it was probable they had not, mere probability would not suffice. *State* v. *Prescott*, 7 New Hamp. 297; *Commonwealth* v. *McCall*, Va. Cases, in note in 1 Cowen, 236–7; *Brant* ex dem. *Buckbee* v. *Fowler*, 7 Cowen, 562.

2. The Court erred in permitting the jury to retire to consider of their verdict, without being attended by a sworn officer.

The record is silent upon this subject. It does not show whether the jury was, or not, attended by a sworn officer.

The law is imperative, that when the jury retire to consider of their verdict in any criminal case, a constable, or other officer, shall be sworn to attend them. Rev. Laws, 1833, 214, § 179.

And the Court cannot presume, in the absence of any statement upon the subject, either that it was done, or that it was dispensed with by the consent of parties.

It is, as a general principle, right to presume that the Court has acted correctly in all cases of discretion, unless the contrary appears of record; but, even in cases of discretion, no material proceeding which is entirely omitted can

be supplied by intendment. *Jones* v. *The State*, 2 Blackf. 479; *Commonwealth* v. *Doty*, 2 Metc. 18; *Van Doren* v. *Walker*, 2 Caines, 373; *Fink* v. *Hall*, 8 Johns. 437; *Beekman* v. *Wright*, 11 Johns. 442, and authorities before cited.

But, here, no discretion is reposed in the Court. The law is explicit and imperative, that in all criminal cases an officer shall be sworn to attend the jury. This is admitted to be the law; but it is insisted that when the record is silent upon the subject, it is to be presumed that the requisitions of the law were complied with, and such is understood to be the doctrine held by the Court in the case of *McKinney* v. *The People*, and the reason assigned is, that swearing an officer to attend upon the jury constitutes no part of the regular proceedings in the progress of the trial, and need not, therefore, be shown by the record to have been done.

But ought it not to appear of record? The law has devolved upon the Court the duty of seeing that in criminal cases, above misdemeanors, the jury shall not retire unless attended by a sworn officer of the Court, and the record is intended to preserve the evidence of the acts performed by the Court during the progress of the trial, that nothing may be left to inference or intendment, but that the regularity and legality of the proceeding may be manifested by the record.

All trials for criminal offences shall be conducted according to the course of the Common Law, and, according to the course of the Common Law, it was deemed necessary for the record to show, in criminal cases, that the juries were attended, when they retired, by sworn officers. *King* v. *Stone*, 6 D. & E. 246, top paging.

It is also said, that when it does not appear from the record that a sworn officer attended the jury, it may be fairly presumed that the defendant consented that they might retire without. This is a presumption which, under our statute, cannot be indulged. The proviso to the section providing for the attendance of a sworn officer is: "That in cases of misdemeanor only, if the prosecutor and the person on trial shall agree, which agreement shall be entered upon

the minutes of the Court, to dispense with the attendance of an officer upon the jury, it shall be *lawful* for the Court to carry into effect any such agreement."

Would it not, therefore, be *unlawful* for the Court to give effect to any such agreement where the offence charged was of a higher grade than misdemeanor? And if the Court could execute the agreement thus made between the parties, must not the existence of the agreement be shown by the record? The doctrine contended for would involve what, to our minds, seems an absurdity, viz: that in cases of misdemeanor only, the Court cannot presume an agreement to dispense with the attendance of a sworn officer upon the jury, but that consent, if it was really given by the defendant, must be at-tested by the record; whilst, in prosecutions for felony, in-volving consequences of so much greater magnitude to the defendant, consent may be presumed, and life or liberty taken away, by an intendment unauthorized by law and against the fact.

A recognition of a departure from the rules of law in one case might lead to the adoption of another, and, finally, those barriers, which are guaranties for the regular and impartial conducting of criminal cases, might be frittered away, and cause interminable perplexity, and possibly eventuate in gross injustice. It is much easier to require the observance of the mandates of the law, than to determine in what cases they may safely be dispensed with. *Guykowski* v. *The People*, 1 Scam. 480.

The law prohibits juries from retiring in criminal cases, unless attended by a sworn officer. The law prohibits aliens from being jurors. Can a defendant, on trial, dispense with the provisions and requirements of the law in the one case more than in the other? And this Court has already de-cided, that where an alien is called as a juror, and not chal-lenged, and the accused may be considered as tacitly assenting, by not objecting to his serving on the jury, still he cannot be rendered competent to serve by the presumed as-sent of the accused, because the law has not admitted him to act in such capacity. Ibid.

3. The Court erred in permitting the witness, Phillips, to testify as stated in the bill of exceptions.

Papers were placed in his hands which he had never seen before, written by a person with whose handwriting he had no previous acquaintance, and he was asked to state, and did state to the jury his opinion whether erasures and alterations had not been made in them since they were written. This was not proof of a fact, but the witness' opinion upon a matter, about which any and every other person was as competent to form an opinion as himself. It was a question which required no peculiar skill in its decision. It was to be determined by inspection, not by skill; by accuracy of vision, not memory or knowledge.

The witnesses who had seen the writings made, and had had the custody of them, had already testified that they were in the same condition as when first written, and it was unwarrantable to permit a witness who had never before seen them, to give the jury his opinion as to appearances which must have been equally palpable to all others as to himself. It was a matter about which the jury might have formed their own opinions, upon the information of their own eyes, but the conclusions of others should not have been given to them as evidence by which their judgments were to be controlled. The English Courts have very uniformly followed the rule, excluding evidence of writing founded upon a mere comparison of hands by witnesses.

In some of the States, the rule has been so modified as to admit of this mode of proof; but when allowed, the comparison is to be made by the jury, and not by witnesses. *Homer* v. *Wallis*, 11 Mass. 312; *Tilford* v. *Knott*, 2 Johns. Ca. 214. And why? Because it is to be determined by inspection alone, and not by any fact within the knowledge of the witness, or information imparted by him, and that inspection the jury must make for themselves. The office of a witness is to communicate to the jury *facts* within his knowledge, which are pertinent to the case, and which tend to establish the issue between the parties. Here he does not pretend to state facts, but gives to the jury his vague con-

jectures founded upon the examination of a paper for the first time placed in his hands.

A witness will not be, permitted to answer, whether from his knowledge of handwriting he believes the handwriting in question to be a genuine signature, or an imitation. *Gurney* v.*Langlands*, 7 Eng. Com. Law R., 118. And this for the same reason, that if that question is to be decided in reference to a paper before the jury, it is to be done by inspection, which they must make for themselves. It was also stated to the jury by this witness, that the papers alleged to be forged were in a genuine, and not a feigned hand.

It is submitted that this evidence should all have been excluded. Its influence upon the jury, its agency in producing the verdict which was subsequently returned, cannot be estimated by the Court. It is enough that the evidence was improper. The admission of illegal evidence is, in general, sufficient ground for a new trial, however immaterial it may appear to the Court. *Lloyd* v. *Monpoey*, 2 N. & M., 446; *Everingham* v. *Laughton*, 2 McCord, 157; *Antoine* v. *Coit*, 2 Hall, 40; *Commonwealth* v. *Green*, 17 Mass. 515; *Craddock* v. *Craddock*, 3 Littell, 78–9.

4. In excluding the evidence of the witness, Crawford.

It is a general rule, that a witness who has seen the party write, although but once, is competent to prove his handwriting. 2 Stark. Ev. 652. And this without any reference to the time at which he saw him write, whether before or after the paper in controversy was made. *Johnson* v. *Daverne*, 19 Johns. 136; *Tharpee* v. *Gisburne*, 12 Eng. Com. Law R. 8.

The proper question is to ask a witness whether he has seen the party write, (without any reference to the time when,) and if he answers affirmatively, then whether he believes the paper in dispute to be his handwriting. And whatever degree of weight the witness' testimony may deserve, which is a question exclusively for the jury, it is an established rule, that if he has seen the person write, he will be competent to speak to his handwriting. 1 Phil. Ev. 484, Cowen & Hill's

Ed; *Eagleton & Coventry* v. *Kingston*, 8 Vesey, 473; 1 Greenl. Ev. 646, § 577, note 2.

This general rule is admitted by the counsel for the People, but it is insisted that to this general rule there are exceptions, and that the witness, Crawford, falls within the exception. This, it is incumbent upon them to establish, and if they fail, the general rule must prevail.

What, then, is the exception, and have they brought themselves within it? The only exception adverted to is the case in 1 Esp. 14. There the witness was asked if he had ever seen the party write. He answered that he had, several times, but a few days before, when the party wrote his signature in his presence for the express purpose of enabling the witness to swear to it. The Court decided the witness incompetent, but for what reason? No stress is laid upon the time at which the witness saw the party write. It is not even alluded to. The Court placed its decision expressly upon the ground that the party wrote it in the presence of the witness for the avowed purpose of enabling the witness to swear for him.

Crawford had seen Pate write, and the Court should have presumed that it was in the ordinary course of business, nothing appearing to the contrary. It was not until after the controversy arose between Pate and Randall, but for aught that appears to the contrary, long before any charge of forgery was made against Pate. To exclude this evidence, then, the Court must go the length of saying that, in no case, shall proof be made by a witness who never saw the party write until after the paper in dispute was made, and it is not pretended that any such rule exists.

It is said that the evidence, if admitted, would have been immaterial; that the question was not whether the papers alleged to be forged were in the prisoner's handwriting; that they may have been by his procurement.

To this we answer, that the precise question was as to the prisoner's handwriting. There was no pretence of procurement, or that the papers were written by any other person than the prisoner; and the prosecution had already given

evidence to prove that they were in the defendant's hand-writing. It was, therefore, very material for him to prove that they were not.

As, therefore, Crawford's evidence was material, and was excluded when it should have been admitted, the assignment of error questioning this decision of the Court below must be sustained. *Goodright* ex dem. *Stevens* v. *Moss*, 2 Cowp. 295; *Coleman* v. *Allen*, 3 J. J. Marsh.

5.    In giving instructions on behalf of the prosecution as asked.

By the provisions of our Criminal Code, juries are declared to be judges of the law, as well as the fact, in all cases. Rev. Laws, 1833, 214. Now a strict adherence to this rule would deny to the Court the right to expound the law to a jury in a criminal case at all. No authority to do so is to be found in our statutes. So, no express authority is to be found in the statute for granting new trials in criminal cases, and it is denied by the attorneys for the People that any such power exists or can be exercised.

Now it is not intended to deny that the Court may pronounce the law to the jury. It is granted to be important that the Court should do so, as well for the punishment of guilt, as for the vindication of innocence. But when the finding of the jury is most manifestly and flagrantly against law, and the Court then declares that it has no power to control or correct the injustice of the verdict, surely it is a reason why the Court should not be permitted to contribute to an erroneous finding. If the Court is powerless for good, it should alike be powerless for evil. If the Judge is to be a mute, unthinking statue after the verdict, he should be equally so before.

Admitting, however, the power, the objection is that the instructions are entirely abstract. *Ross* v. *Garrison*, 1 Dana, 35; *Elting* v. *U. S. Bank*, 6 Peters' Cond. R. 220; *Hamilton* v. *Russell*, 1 do. 320; *Atkinson* v. *Lester*, 1 Scam. 409; and would apply as well to any other case in which circumstantial evidence had been given as to this case.

The tendency of the instructions was to make an erro-

Pate v. The People.

neous impression upon the jury, and to mislead them in their views of the case. They assume, or pre-suppose a fact proper for the consideration of the jury. *Lightburn* v. *Cooper*, 1 Dana, 273; *Bowman* v. *Bartlett*, 3 A. K. Marsh. 86. The rule is that the instructions shall be positive and specific, and that nothing be left to intendment. *Snyder* v. *Laframboise*, Bre. 268.

6. In modifying the instructions asked by the defendant, as stated in the bill of exceptions.

It is submitted that the instructions of the defendant stated the law correctly, were pertinent to the case, and should have been given as asked. But the Court modified them, and told the jury, that before they could acquit the prisoner, they must be satisfied that there was more than a *mere probability of his innocence*. If there must have been more than a probability of innocence to entitle him to acquittal, less than a probability of guilt would be sufficient to warrant his conviction. This instruction overturns and reverses the rules of law, as heretofore understood, that the accused shall be presumed innocent until his guilt is made manifest, and that if the jury have doubts of his guilt, that he shall have the benefit of those doubts; and substitutes for them the harsh and unreasonable doctrine, that he shall be presumed guilty until he establishes his innocence, and that if there are doubts of his innocence, the prosecution is to have the benefit of such doubts.

This instruction could not fail to impress the jury with a most erroneous conception of their duty, and of the rules by which they were to be governed in arriving at a verdict; and where the judge has erroneously instructed the jury in a matter of law which may have influenced their verdict, the judgment must be reversed. *Baylies* v. *Davis*, 1 Pick. 206; *Lane* v. *Crombie*, 12 do. 177; *Boyden* v. *Moore*, 5 Mass. 369–79. And this, notwithstanding the verdict may appear to be right upon the proof. *Gaines* v. *Buford*, 1 Dana, 481; *Wardell* v. *Hughes*, 3 Wend. 419.

Points upon the question of a new trial:

At Common Law, where the jury found the prisoner guilty contrary to the evidence, the Court, in many instances, set

aside their verdict, and granted a new trial. 4 Black. Com. 361–2; 2 Hawk. P. C. 623, ch. 47 § 12.

And while the above authorities advert to no distinction between felonies and misdemeanors in reference to new trials, it is certain that, at Common Law, new trials were granted only in cases of misdemeanors. In cases of treason and felony, on a conviction upon insufficient evidence, the usual course was to apply to the Crown for a pardon on the certificate of the Judge who presided at the trial. 2 Russell on Crimes, 589; 13 East, 416, note *b; Rex* v. *Mawbey,* 6 T. R. 619, 638.

In this country the law is otherwise. It was once held in New York to be an unsettled question, whether a person who had been acquitted could be re-tried, on account of the misdirection of the Judge to the jury. *The People* v. *Mather,* 4 Wend. 229.

Yet this question was soon after settled by the same Court, against the application in the case quoted by the opposite counsel. *The People* v. *Comstock,* 8 Wend. 549.

But, long before either of these decisions, it was decided by the same Court that the prisoner, convicted of perjury, was entitled to a new trial, where the verdict was against the evidence. *The People* v. *Townsend,* 1 Johns. Cases, 104.

And the same doctrine was re-affirmed in the case below, on the ground that the English law on the subject of new trials in cases of treason and felony had never been adopted in that State, and was inapplicable to this country, and would not be tolerated by the spirit of a free people. *The People* v. *Stone,* 5 Wend. 39, 42–3.

This decision in the 5th Wend. was made in a case arising previous to their Revised Code, which contains a provision requiring the Judges to sign bills of exceptions in criminal cases, yet the Court considered that statute, not at all as conferring the authority on the Courts to grant new trials in criminal cases on the merits, but rather as embodying, in the form of a statute, the pre-existing law of the State.

The same might be said of the 187th section of our Criminal Code, which makes it the duty of the Judge presiding at any criminal trial to sign any bill of exceptions tendered to him *on the trial,* provided it contains the truth. Even if the

power to grant new trials in criminal cases did not exist in this State anterior to this Act, we may safely affirm that it is conferred by this section. As the only object of any bill of exceptions, taken *during the progress of the trial*, is to preserve the evidence, and as the only object of preserving the evidence must be to secure the party a verdict and judgment in accordance with it and the law arising from it, the right to a bill of exceptions would be a barren right, if the defendant could not thereby obtain a review of his case where the jury had, from any cause, mistaken their duty, and rendered a verdict contrary to the law and the facts. Rev. Laws, 1833, 216, § 187; Rev. Stat. 188, § 197.

Yet a bill of exceptions to evidence in cases of treason and felony did not lie at Common Law. 2 Hawk. P. C. 618, Ch. 46, § 198.

In New York, the Courts have uniformly acted on applications for new trials in criminal cases as in ordinary cases, and granted or refused them as the circumstances required. *The People* v. *The Justices of Chenango*, 1 Johns. Cases, 179; *Same* v. *Gray*, 5 Wend. 289; *Same* v. *Vermilyea*, 7 Cowen, 369; *Same* v. *Goodwin*, 18 Johns. 187.

And the same is true of the Courts in Massachusetts. *Commonwealth* v. *Waite*, 5 Mass. 260; *Same* v. *Drew*, 4 do. 291; *Same* v. *Snelling*, 15 Pick. 321; *Same* v. *Child*, 10 do. 252; *Same* v. *Bostwick*, 22 do. 397; *Same* v. *Peck*, 1 Metc. 428.

And it may be affirmed generally of the practice in this country that a new trial will be granted in capital cases, or in case of felonies, for any cause which would be sufficient in a civil action, or on a conviction for a misdemeanor. *United States* v. *Fries*, 3 Dallas, 515; *Commonwealth* v. *Green*, 17 Mass. 515; *Jones'* case, 1 Leigh, 598; *State* v. *Hopkins*, 1 Bay, 375; *Nomaque* v. *The People*, Bre. 109.

The Opinion of the Court was delivered by

TREAT, J. Alonzo Pate was indicted at the April term 1845, of the Adams Circuit Court, for the crime of forgery.

The indictment contained three counts. The first charged the prisoner with the forgery of a receipt for money in these words: "May 13th 1844 I Hav Ths day Received of Alonzo Pate fourteen Hundred dollars Being paid on a Track of land as witness my Hand and Seal this the 13th of May 1844                                      George Randall"
James Fawke

The second count charged him with publishing as true and genuine the same forged receipt.

The third count charged him with the forgery of a contract for the conveyance of land, in these words: "South East Quarter of Section 18 in T 1 N. R 8 W of the 3rd P N O R. Know all men By These presents that I Geor Randall do hav This day Bargained and Sold My track of land to Alonzo Pate for the Sum of fourteen Hundred and fifty dollars Balence on said land fifty dollars whitch I do Bind myself to Relinquish my Right and title on the payment of the Ballence of the money as witness my hand And seal   Georg Randall"
James Fawke

Each of the counts alleged that the act was done with the intention to defraud George Randall.

At the same term the prisoner was arraigned and pleaded not guilty. The jury found him guilty, and fixed the period of his imprisonment in the Penitentiary at nine years. During the trial exceptions were taken to decisions of the Court, in admitting and excluding evidence, and in giving instructions. The prisoner entered a motion for a new trial on the ground of newly discovered testimony, and because the verdict was contrary to the evidence. This motion the Court denied, and a bill of exceptions was taken embodying the whole of the testimony. The Court having passed sentence on the prisoner, he sued out a writ of error to this Court, and obtained a *supersedeas* thereon.

The errors relied on for the reversal of the judgment are, *first*, the Court erred in admitting the testimony of Phillips; *second*, in excluding the testimony of Crawford; *third*, in giving the instructions asked for by the prosecution; *fourth*,

in qualifying the instructions asked for by the prisoner; *fifth*, in allowing the jury to separate without the consent of the prisoner; *sixth*, in permitting the jury to retire from the bar without being in the charge of a sworn officer; and *seventh*, in not granting a new trial. These errors will be considered in their proper order.

*First.* Was the testimony of Phillips properly received? A bare reference to the testimony which he gave, and the object for which it was introduced, will clearly show that there was no valid objection to it. Randall, the prosecuting witness, testified that the receipt and contract described in the indictment were never executed by him, and he proceeded to point out instances wherein the style of writing and spelling differed from his own. For the purpose of contradicting him, the prisoner introduced other papers written and signed by Randall, which corresponded in these particulars with the documents alleged to be forged. The prosecution then had the undoubted right to rebut this testimony and sustain Randall. A legitimate way of doing it was by showing that the papers introduced by the prisoner, and which by the evidence had been traced to his possession previous to the trial, were originally written, as stated, by Randall, but had since been made to resemble the forged writings by alterations and erasures. Phillips was placed on the stand for the purpose of examining them critically, and then expressing his opinion to the jury, whether there had been such erasures or alterations. His conclusion was, that erasures had been made in the particular instance pointed out by Randall. It had been the business of the witness for many years, as an officer of a bank, to examine papers with the view of detecting alterations and erasures, and ascertaining spurious from genuine writings and signatures. He was, therefore, a person skilled in the matters concerning which he was called to give testimony, and as such was competent to express his opinion to the jury. It was insisted on the argument, that the question whether there had been erasures was one to be determined by the jury on an inspec-

tion of the papers, without the aid of other testimony. It can hardly be supposed that the jurors were as competent to form a correct opinion on this subject as a witness peculiarly qualified by years of practical experience. Erasures might be easily discovered and pointed out by such a witness, which would otherwise escape the observation of men unaccustomed to detecting them. The Court was right in allowing the minds of the jury to be enlightened by the opinion of a witness possessing this superior knowledge.

*Second.* Was the testimony of the witness, Crawford, properly excluded? Crawford was called by the prisoner, and after testifying respecting other matters, stated that he had never seen the prisoner write before the difficulty arose between him and Randall. The counsel for the prisoner then asked the witness to state from his knowledge of the prisoner's hand writing, whether either the receipt or contract alleged to be forged was written by him. The prosecution objected to the question and the Court sustained the objection. The general rule on the subject of the proof of hand writing is well understood, and will be briefly stated. The proof is not to be made by the comparison of hands, but by the production of witnesses, who have acquired a knowledge of the general character of the hand writing of the party. The modes of acquiring this knowledge are, either by having seen him write, or by having seen letters or other documents which the party has, in the course of business, recognized or admitted to be his own. A witness who has thus become acquainted with the hand writing of the party, is allowed to examine the writing in question and declare his belief, founded on his previous knowledge, concerning its genuineness. In this case, the witness did not come within the rule. No sufficient foundation was laid for the introduction of his opinion. It did not appear that he had such a knowledge of the prisoner's hand writing as would authorize him to speak concerning the genuineness of the writings in question. He did not state that he was acquainted with his hand writing. He had not seen him write, unless that is to be inferred from the

statement, that he had never seen him write before the hap-
pening of a particular contingency.  A witness ought first
to be asked if he is acquainted with the hand writing of the
party.  If he answers in the affirmative, he is then to be
asked, how he obtained the knowledge.  It is only when he
professes to have this knowledge, acquired from legitimate
sources, that he is permitted to express an opinion.  He may
have seen the party write and still be unable to distinguish
his hand writing.

*Third.*  Did the Court err in giving the instructions asked
for by the prosecution?   These instructions contain correct
principles of the law as laid down in the elementary works
on Evidence.   This is not denied by the counsel for the pri-
soner, but they insist that the instructions were mere abstract
propositions of law, having no applicability to the facts of
the case, and as such should have been withheld.   It has
often been decided that Courts are not bound to instruct the
jury on abstract questions of law, which have no direct bear-
ing on the facts of the case before them; but no case has
gone the length of holding that the giving of such instruc-
tions is error.   It is only when the Court in declaring the
law states it erroneously, that its opinion can be revised;
and then if it appear that the instructions could have had
any influence on the jury, their verdict will be set aside.

*Fourth.*   Did the Court err in giving the qualification to
the instructions called for on the part of the prisoner?   It
appears from the record, that the Court gave all of the in-
structions demanded by the prisoner, with the single expla-
nation as to the meaning of a reasonable doubt, as follows:
"That there should be more than a bare *probability* of the
defendant's innocence; that they should have a reasonable
doubt of his guilt, growing out of the unsatisfactory nature
of the evidence; such a doubt as would induce a reasonable
man to say, I am not satisfied that the defendant is guilty."
This instruction, as it reads, is not technically correct, but
by inserting the word "possibility" in the place of "proba-
bility," it would not be obnoxious to any just exception.

It is most likely that the Court in giving the explanation made use of the former word, and that in copying the instructions into the bill of exceptions, the latter word was by mistake inserted in lieu of it. But proceeding on the ground that the instruction is correctly copied, it is very evident from the whole record that it could not have had the slightest influence on the jury prejudicial to the prisoner. The instructions given, as well at the instance of the prosecution, as of the prisoner, assert in emphatic terms the familiar doctrine of the law, that the jury are bound to acquit the defendant if they entertain any reasonable doubt of his guilt. The explanation itself, when all taken together, clearly indicates that the Court fully recognized this principle, and did not intend to contravene it; and such we entertain no doubt was the understanding of the jury.

The *fifth* and *sixth* assignments of error present questions of the same character, and both will be disposed of together. On these points, it appears from the record that the trial continued through several days, and that the jury were permitted to disperse on each adjournment of the Court; but the record is silent as to the fact whether the separation was with the consent of the prisoner, and it fails to show that the jury were in charge of a sworn officer when they retired to consider of their verdict. These questions arose in the case of *McKinney* v. *The People*, 2 Gilm. 540, and we there held, that the record need not show what disposition was made of the jury during the progress of the trial, and when they retired to agree on their verdict; that the presumption was that the Court performed its duty in such respects, and that if the jury were allowed to disperse without the consent of the prisoner, or to retire from the bar without being in the charge of a sworn officer, it was incumbent on the prisoner, if he objected to such irregularities, to introduce them into the record by a bill of exceptions. The presumption from this record is, that the prisoner consented to the separation of the jury, and that the Court performed its duty by requiring a sworn officer to accompany the jury in their retirement.

*Seventh.* Ought the Court to have granted a new trial? Prior to the passage of the Act hereafter mentioned, this Court repeatedly decided that applications for the continuance of causes, and for new trials, were matters addressed to the sound discretion of the Circuit Courts, and that their decisions thereon could not be assigned for error. *Vickers* v. *Hill,* 1 Scam. 207; *Wickersham* v. *The People,* Ib. 128, and the numerous cases refered to in a note to that case. The second section of the Act of the 21st of July, 1837, and which is incorporated in the Revised Statutes, provided that the decisions of the Circuit Courts in overruling motions for new trials, and for continuances, might be assigned for error. Acts of 1837, 109; Rev. Stat. 416. It will be seen, then, that applications for continuances and for new trials are placed on the same footing, both by the adjudications of this Court, and the enactments of the Legislature. This Court during the present term, in the case of *Baxter* v. *The People,* on the direct question whether the Circuit Court had erred in refusing the defendant a continuance in a criminal case, deliberately decided that the foregoing provision of the statute was solely applicable to civil causes, and had no relation whatever to criminal cases. The reasons for that conclusion are there given, and need not here be recapitulated. That decision is necessarily conclusive of the question presented by this assignment of error. In criminal cases, therefore, motions for new trials still rest entirely in the discretion of the Circuit Courts, where they are made, and the propriety of their decisions in refusing them cannot be reviewed in this Court.

But if the reverse was the rule, this case would not justify the interposition of the Court. The evidence exhibits a strange but flagrant case of forgery, to which the prisoner did not scruple to superadd the crime of perjury; the object of the one, to wrest from an honest citizen the whole of his estate; the design of the other, to visit on the head of an innocent man the ignominy and punishment so fully deserved by himself. The jury returned a righteous verdict, and the Court

very properly exercised its discretion in refusing to disturb it.

The judgment of the Circuit Court is affirmed with costs.*

The following dissenting Opinion was delivered by

PURPLE, J.   I dissent from the Opinion of the Court upon one point in this case.   It is in reference to the explanation given by the Circuit Court to the jury as to the meaning of a reasonable doubt.   This explanation was, "that there should be more than a bare probability of the defendant's innocence; that they should have a reasonable doubt of his guilt, growing out of the unsatisfactory nature of the evidence, such a doubt as would induce a reasonable man to say, I am not satisfied that the defendant is guilty."   If I have rightly apprehended the character of this instruction, the jury are advised that if there is but a probability of the defendant's innocence, he is to be considered guilty.

In my opinion, it was clearly erroneous.   If the jury had been told that there should be more than a bare probability of the defendant's guilt instead of "innocence," the instruction with what followed would have been unexceptionable. It may be that such was really the case.   But it is not so in the record; and to me it seems a most dangerous practice to presume it.

It is supposed in the Opinion of the Court, that this portion of the instruction is so qualified and explained by the succeeding paragraph, that taken all together the jury could not have misapprehended the meaning of the Court, and that no prejudice could have possibly resulted to the prisoner.

---

* A petition for a re-hearing was filed, and denied.   One of the points made was, that the Court misapprehended the testimony of Crawford.   In the bill of exceptions, as embodied in the transcript of the record, a word had been omitted, and was supplied by consent of counsel, and interlined with a pencil. The word was dimly written, and escaped the attention of the Judge who drew up the Opinion.   The omission occurred in the following sentence, to wit: "I have seen Pate *write*.   I never saw Pate write before his difficulty with Randall."   The word italicised was omitted.   The Court, however, in the verbal opinion announced, stated that this fact would not change the decision of the case.

Pate *v*. The People.

I am at a loss to know how they could have understood it. In one sentence they are told, that if they have a reasonable doubt of his guilt, he must be acquitted; and in the next, that there must be more than a bare probability of his innocence. If there is a probability of innocence, every reasonable man must doubt of guilt. If there is but a probability of guilt, the law determines that the accused is innocent.

Which portion of the instruction given in this case was regarded by the jury as the law it is impossible to determine. The verdict was against the plaintiff here, and this Court cannot know but that the whole turned upon that part of the instruction which was illegal.

For this error only, I think the judgment of the Circuit Court should be reversed.

WILSON, C. J. said:

I concur in the views expressed by Judge Purple in this case.

*Judgment affirmed.*

MEMORANDUM.

THE present volume contains all the Opinions of the Supreme Court, which have been delivered and not hitherto published. There yet remain five or six cases where Opinions have not been filed, which were decided at the December Term 1846.